Not for Publication

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **NOVARTIS SERVICES, INC.,**<br><br>       Plaintiff,<br><br>    v.<br><br>**ADAM L. FEIRE,**<br><br>       Defendant. | Civil Action No. 24-10097 (ES) (JSA)<br><br>MEMORANDUM and OPINION |

**SALAS, DISTRICT JUDGE**

  This matter comes before the Court upon plaintiff Novartis Services, Inc.'s ("Novartis" or "Plaintiff") motion for an "order to show cause seeking a preliminary injunction with temporary restraints and expedited discovery" against defendant Adam L. Feire ("Feire" or "Defendant"). (D.E. No. 4 ("Motion")). Plaintiff initiated this action in New Jersey state court on October 24, 2024 (D.E. No. 1, ¶ 1), with an order to show cause seeking a preliminary injunction, temporary restraints, and expedited discovery (D.E. No. 1-2). Defendant removed the matter to this Court on October 27, 2024. (D.E. No. 1).

  Novartis claims to be "one of the largest pharmaceutical companies in the world . . . focused on the discovery, development, manufacture, and marketing of prescription pharmaceutical products." (D.E. No. 1-1 at 6, ¶ 12).[1] It provides treatments for a wide range of ailments, including but not limited to, "cancer, cardiovascular diseases, dermatological conditions, neurological disorders, renal conditions, ophthalmic and respiratory diseases, hematologic diseases, solid

---

[1] All pin citations to Docket Entry Number 1-1 are to the pagination automatically generated by the Court's CM/ECF Case Management System. Pin citations to the Complaint contained within Docket Entry Number 1-1 include both page and paragraph numbers.

tumors, immune disorders, and infections." (*Id.*). Defendant is a former Novartis employee and a Massachusetts resident. (*Id.* at 7, ¶ 17 & 13, ¶ 43). During his near eighteen-year tenure at Novartis, Defendant held various positions. (*Id.* at 7–8, ¶¶ 17–25).

Plaintiff raises one count for breach of contract against Defendant for alleged violation of a non-compete agreement he entered near the end of his career at Novartis. (*Id.* at 8, ¶ 26 & 17–19, ¶¶ 64–71). According to the Verified Complaint, Defendant signed an Executive Agreement on November 12, 2023, in connection with the alleged expansion of his role as Novartis's Global Head of Search & Evaluation, which he assumed in roughly August 2022.[2] (*Id.* at 8, ¶¶ 26–27).

---

[2] Although the Complaint states Defendant's promotion occurred in September 2022, declarations from both parties reflect the elevation occurred in August 2022. (D.E. No. 20-1 (Supplemental Declaration of Susanne Kreutz ("Supp. Kreutz Decl.")) at ¶ 6; D.E. No. 18-1 (Declaration of Adam Feire ("Feire Decl.")) ¶¶ 3, 14 & 16). In any event, this discrepancy appears immaterial.

The parties shed light on the seemingly odd timing of the Executive Agreement—executed over a year after Defendant's promotion—in their opposition and reply papers. The parties agree Novartis underwent an internal reorganization of certain "functions," including their business development and licensing functions; however, Defendant asserts this reorganization began in mid-2022 around the time of his promotion, while Plaintiff states it occurred in early 2023. (*Compare* Feire Decl. ¶¶ 13 & 18, *with* Supp. Kreutz Decl. ¶¶ 7–8). Defendant maintains, and Plaintiff disputes, that his title changed from "Global Head of Search & Evaluation" to "Global Head of Search & Evaluation, Corporate Business Development" sometime in early 2023 after a second round of reorganization. (*Compare* Feire Decl. ¶ 18, *with* Supp. Kreutz Decl. ¶¶ 4–6). Defendant claims he worked with Ms. Kreutz "to more clearly define [his] role as Global Head of Search & Evaluation, Corporate Business Development" in order to "capture the full scope of [his] ***then-current*** responsibilities to ensure the position was treated as appropriately senior within Novartis for compensation purposes." (Feire Decl. ¶ 21 (emphasis added)). Thus, Defendant's position appears to be that he had the same responsibilities at Novartis from the inception of his role as Global Head of Search & Evaluation in August 2022 to post-reorganization and through his voluntary resignation in June 2024.

In response to Defendant's argument and contrary to the broad allegations recited below, Plaintiff narrows the timeframe during which Defendant became involved in Novartis's mergers and acquisitions transactions. Specifically, Ms. Kreutz states Defendant became responsible for both business development and merger and acquisition targets as of January 2023, following Novartis's combining of its "Business Development and Mergers & Acquisition functions." (Supp. Kreutz Decl. ¶¶ 7–8). In August 2022, when Defendant became Novartis's Global Head of Search & Evaluation, she asserts his main responsibility included "identifying targets for licensing deals through Novartis's Business Development function" and that he did not, "[a]t that time . . . have access to material information concerning corporate-level mergers and acquisition transactions." (*Id.* ¶ 6). Accordingly, Ms. Kreutz asserts Defendant only received broader access to confidential and proprietary information "such as the efficacy and safety of certain molecules and therapeutics" ***after*** Novartis combined its business development functions with its merger and acquisition functions in January 2023. (*Id.* ¶ 8). Furthermore, Ms. Kreutz asserts Defendant asked for a retroactive compensation increase in connection with his expanded role in early 2023. (*Id.* ¶ 10). The parties purportedly negotiated the terms of Defendant's promotion between May and October 2023, which culminated in the Executive Agreement, effective September 1, 2023, that provided for a "releveled" position effective January 1, 2024, and an increase in salary. (*Id.* ¶ 14). In sum, the parties dispute whether the Executive Agreement applied to Defendant's August 2022 promotion or a subsequent promotion and/or expansion of his responsibilities.

2

Defendant voluntary resigned from Novartis on June 20, 2024. (*Id.* at 13, ¶ 43).

Ms. Susanne Kreutz, Novartis's Global Head of Corporate & Business Development, directly managed Defendant from January 2023 until his resignation. (D.E. No. 4-2 (Declaration of Susanne Kreutz ("Kreutz Decl.")) ¶¶ 1 & 10). In support of Plaintiff's Motion, Ms. Kreutz declares that "[t]hrough his resignation, [Defendant] was responsible for identifying and triaging external acquisition and licensing opportunities in the pharmaceutical and biotechnology arenas to fill gaps in the Novartis portfolio" such that his "work touched on every aspect of Novartis's business." (*Id.* ¶ 12). According to the Complaint, as Global Head of Search & Evaluation, Defendant allegedly had "access to a significant amount of confidential and proprietary information and trade secrets concerning all aspects of Novartis's global short-term, mid-term, and long-term business strategies, pipeline developments, mergers/acquisition strategies, licensing strategies, launch strategies, and talent management strategies." (D.E. No. 1-1 at 10, ¶ 31). In addition, Plaintiff asserts Defendant "had access to information concerning Novartis's internal portfolio and business as well as internal analyses of potential acquisition and licensing opportunities." (*Id.*).[3] Plaintiff represents the average life cycle of these transactions ranges between six to nine months—from identification and evaluation through execution. (*Id.* at 7, ¶ 15).

As noted above, although Defendant had been promoted to Global Head of Search & Evaluation in the second half of 2022, Novartis gave Defendant an Executive Agreement (detailing Defendant's purportedly new role), on or about October 4, 2023. (D.E. No. 1-1 at 24–46 ("Ex. 1

---

[3]  Before his latest promotion, Defendant served as Novartis's Director of Search & Evaluation, Business Development & Licensing. (D.E. No. 1-1 at 8, ¶ 23). In that role, according to the Complaint, Defendant's duties included "identifying, evaluating, and serving on deal teams to negotiate transactions for [Novartis Institutes for BioMedical Research, Inc.]; searching for opportunities in the pharmaceutical, biotechnology and academic arenas for compounds, technologies, and alliances; and coordinating the due diligence process for technologies and licensing." (*Id.*).

3

to Compl.") at 25). Novartis backdated the Executive Agreement to September 1, 2023, and Defendant signed the Executive Agreement on November 12, 2023. (*Id.* at 25 & 46). Moreover, the cover letter to the Executive Agreement provided that Defendant's "role [was] remote, and both the role and [his] workplace are based in Boston, Massachusetts." (*Id.* at 25; *see also* Kreutz Decl. ¶ 21 (acknowledging Defendant provided services for Novartis in Massachusetts)). Relevant here, the Executive Agreement contains the following "Non-Competition" provision—the only non-compete Defendant entered during his tenure at Novartis (Feire Decl. ¶ 7):

> During the term of the Executive's employment with the Company and ***for a period of six (6) months following their termination***, they shall not, within the geographic area in which they provided services to the Company or had material presence or influence during the last two years of employment, directly or indirectly, ***provide services similar to those they provided to the Company during the last two years of their employment*** to any business with which the Company is in substantial competition (either with products in research, development, or which are marketed) ***and in which the Executive could use or disclose any of the Company's trade secrets or confidential information that they utilized during employment with the Company or which were otherwise disclosed to them as a result of that employment.*** This includes, but is not limited to, the comparator healthcare peer group of competing organizations identified in the [Long-Term Incentive Plan] and referenced in Section 3 of your Executive Agreement. This group of competing organizations is subject to change from time to time in the sole discretion of the Company. ***Any post-employment limitation shall be determined by the activities of the Company as of the time of the termination.***

(Ex. 1 to Compl. at 32 (emphasis added)).

On June 20, 2024, Defendant voluntarily resigned from Novartis and notified Plaintiff that "he would be accepting a business development position with Biogen Inc. [("Biogen")]." (D.E. No. 1-1 at 13, ¶ 43). According to Ms. Kreutz, Defendant informed her "he had accepted the same or a similar role in business development at Biogen Inc." (Kreutz Decl. ¶ 21). Plaintiff maintains Biogen is "a global pharmaceutical and biomedical company that focuses on developing and

4

producing therapeutic treatments that directly compete with Novartis, including in the areas of neurology, immunology, renal and rare diseases." (*Id.* ¶ 22; *see, e.g.*, D.E. No. 1-1 at 4–5, ¶ 4 (alleging "Novartis and Biogen are undeniably competitors" because "Biogen has publicly acknowledged that a number of its therapeutics that treat neuroscience and renal diseases and conditions are directly competitive with those offered by Novartis")).

The parties agree Defendant's last day of work at Novartis was June 21, 2024. (D.E. No. 1-1 at 105–10 ("Ex. 4 to Compl.") at 106; Feire Decl. ¶ 1). The parties also both acknowledge Defendant remained on Novartis's payroll through on or about August 20, 2024. (Ex. 4 to Compl. at 106; Feire Decl. ¶ 43). In addition, Plaintiff does not dispute several representations Defendant makes in opposition to the instant Motion. (*See generally* Reply Br.). For example, Defendant's declaration reflects that on June 21, 2024, he returned all of his Novartis property, including his computer, cell phone, and security badge for Novartis's campus buildings in Cambridge, Massachusetts. (Feire Decl. ¶ 41). He has not had access to Plaintiff's confidential information or systems since June 20, 2024. (*Id.* ¶ 24). On September 30, 2024, Defendant commenced his role at Biogen as "Head of Business Development/M&A and External Innovation"[4] and confirmed he did not have any Novartis "information, documents or property" with him or in his possession. (*Id.* ¶¶ 45 & 47). He has not accessed or disclosed any of Novartis's confidential information to Biogen or anyone else. (*Id.* ¶ 49). Moreover, he has not communicated with "any acquisition or licensing therapeutic targets that were, to [his] knowledge, actively being considered by Novartis at the time of [his] departure." (*Id.* ¶ 52).

On June 28, 2024, eight days after Defendant's resignation, Novartis sent Defendant a letter

---

[4] It is unclear whether Plaintiff knew Defendant's expected title at Biogen prior to the commencement of his employment; nonetheless, Defendant states that while his title changed upon his official onboarding at Biogen, the role itself remained the same. (Feire Decl. ¶ 45).

5

reminding him of his non-compete obligations through February 20, 2025 (i.e., in its view, the end of Defendant's restrictive period—six months from August 20, 2024, Defendant's last day on Novartis's payroll). (Ex. 4 to Compl. at 109–10). In addition, Novartis highlighted Biogen's "directly competing marketed products" for treatment of Multiple Sclerosis and Spinal Muscular Atrophy, as well as "directly competing products in development" for treatment of Alzheimer's Disease, Parkinson's Disease, and IgA Nephropathy. (*Id.*). Although Novartis's letter requested Defendant's signature as an acknowledgement and confirmation of his post-employment obligations within five business days, Defendant never executed the acknowledgement.[5] (*See generally* D.E. No. 1-1). Instead, nearly one month later, on July 24, 2024, counsel for Defendant responded to Novartis's letter. (D.E. No. 1-1 at 111–15 (Ex. 5 to Compl.)). In sum, the letter notes Defendant "made a fair and reasonable proposal designed to address any potential concerns Novartis might have with his ***near-term employment with Biogen***," but that Novartis ignored the offer. (*Id.* at 114 (emphasis added)). It also clearly states Defendant's position that the non-compete restriction is unenforceable such that he could "commence employment with Biogen on August 21, 2024," but that he was "willing to continue to explore a compromise position." (*Id.*). On July 30, 2024, Novartis's counsel wrote to Biogen directly and demanded Biogen produce, by August 5, 2024, information and documents Novartis needed to protect its legitimate interests. (D.E. No. 1-1 at 116–20 (Ex. 6 to Compl.) at 119).[6] By letter dated August 9, 2024, Biogen's counsel refused to provide the requested materials and noted its belief that the non-compete clause in the Executive Agreement is unenforceable. (D.E. No. 1-1 at 121–22 (Ex. 7 to Compl.) at 122).

---

[5] Novartis also preserved its right to litigate in the absence of such signature but did not proceed with a lawsuit during this period. (Ex. 4 to Compl. at 110).

[6] Based on the record before the Court, between June 20, 2024, and July 24, 2024, Plaintiff did not have any assurances regarding Defendant's potential start date at Biogen.

Beginning on August 1, 2024, counsel for Novartis and Biogen also had external communications by email, text message, and phone. (D.E. No. 4-4 (Declaration of Russell Beck ("Beck Decl.")) ¶¶ 6–17). During those communications, Biogen gave some assurance that Defendant would not commence employment before the end of August. (*Id.* ¶¶ 6 & 9; D.E. No. 18-2 (Declaration of Erik W. Weibust ("Weibust Decl.")) ¶¶ 4 & 6–7). The parties also appeared to engage in at least some loose settlement negotiations. (Beck Decl. ¶¶ 10–15 (refencing an informal offer that Novartis's counsel "previously told" Biogen's counsel he "would make"); Weibust Decl. ¶ 10 (noting Biogen's presentation of a written settlement proposal to Novartis's counsel)). During this period, Novartis's counsel insists he had verbal agreements with Biogen's counsel, in which Biogen agreed to (i) keep Defendant "on the bench" while good faith negotiations occurred, and (ii) inform Novartis of Defendant's expected or actual commencement of work at Biogen. (Beck Decl. ¶¶ 12 & 16). Biogen's counsel firmly denies making these verbal commitments. (Weibust Decl. ¶¶ 9 & 14–15). Between October 1, 2024, and October 23, 2024, counsel for Novartis continued to seek updates on a possible resolution and assurances regarding the commencement of Defendant's employment at Biogen. (Beck Decl. ¶¶ 15–28).[7] Finally, on October 24, 2024, Novartis's counsel received an email from a new counsel for Biogen, indicating—for the first time—that Defendant began employment at Biogen on September 30, 2024. (*Id.* ¶ 29). On the same day, Plaintiff filed suit in New Jersey state court seeking temporary and preliminary injunctive relief. (D.E. No. 1 ¶ 1).

On October 28, 2024, one day after Defendant removed the state court action to this Court, Plaintiff refiled its motion for "a preliminary injunction with temporary restraints" and expedited

---

[7] According to Novartis's counsel, on October 1, 2024, Biogen's counsel represented Defendant had not yet begun employment at Biogen. (Beck Decl. ¶ 16). Biogen's counsel counters that it did not know Defendant had already commenced employment at Biogen as of September 30, 2024. (Weibust Decl. ¶ 14).

7

discovery. (D.E. No. 4). In addition to its moving and reply briefs (D.E. No. 8 ("Mov. Br."); D.E. No. 20 ("Reply Br.")),[8] Plaintiff filed, and the Court reviewed, five declarations in support of the relief it seeks. (Kreutz Decl.; Supp. Kreutz Decl.; Beck Decl.; D.E. No. 4-3 (Declaration of Matthew Standart); D.E. No. 4-5 (Declaration of Harris Mufson, Esq.)). The parties briefed Plaintiff's Motion in accordance with this Court's October 29, 2024 Text Order (*see* D.E. No. 10). (Mov. Br.; D.E. No. 18 ("Opp. Br."); Reply Br.).

For the reasons explained below, the Court views Plaintiff's Motion as requesting a preliminary injunction rather than a temporary restraining order. As the Third Circuit has noted, "[a]t times, it is difficult to distinguish which form of relief has been invoked." *Snee v. Barone*, 359 F. App'x 281, 284 n.4 (3d Cir. 2009) (citing *Nutrasweet Co. v. Vit-Mar Enters.*, 112 F.3d 689, 692 (3d Cir. 1997)). But where, as here, the party purported to request both forms of relief but filed the motion with notice to the opposing party, courts have treated the motion as requesting a preliminary injunction. *See, e.g.*, *id.* This is because "temporary restraining orders are of extremely short duration and typically issue without notice to the opposing party." *Id.* (citing Fed. R. Civ. P. 65(b)). In addition, temporary restraining orders "are ordinarily aimed at temporarily preserving the status quo[,]" *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 160 (3d Cir. 2020), and "preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Id.* (quoting *Granny Goose Foods Inc. v. Bhd. Of Teamsters*, 415 U.S. 424, 439 (1974)). "Where a plaintiff seeks a mandatory injunction rather than a prohibitory injunction, the burden of showing an entitlement to relief is greater, as mandatory injunctions are generally disfavored." *Sanofi-*

---

[8] Although Plaintiff filed a memorandum in support of its Motion as an attachment at Docket Entry Number 4-1, on the same day, and without further explanation, Plaintiff also filed a separate "Memorandum in Support" of its Motion at Docket Entry Number 8. The Court's independent comparison of these documents reflects that they appear to be identical. For purposes of this Memorandum and Order, the Court will cite to the moving brief at Docket Entry Number 8 as the last-in-time filing. (*Compare* D.E. No. 4-1, *with* D.E. No. 8).

*Aventis U.S. LLC v. Novo Nordisk, Inc.*, No. 06-1369, 2006 WL 8457950, at *7 (D.N.J. June 23, 2006); *see Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." (citing *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980))).

Here, Defendant removed this action from state court and thus, has been on notice of Plaintiff's motion from the inception of this case. (*See generally* D.E. No. 1). Plaintiff requests the issuance of "a temporary restraining order and preliminary injunction requiring Feire to adhere to the terms of his non-competition obligations to Novartis." (Mov. Br. at 40).[9] The Court notes that this is not a request to preserve the status quo, as Defendant is already employed by Biogen. (D.E. No. 1-1 at 16, ¶ 57; Beck Decl. ¶ 29; Feire Decl. ¶ 45). Thus, Plaintiff seeks affirmative injunctive relief beyond preservation of the status quo that, if granted, would enjoin Defendant from working in his current position at Biogen during the pendency of this litigation. As such, the Court finds the proper vehicle for the type of relief Plaintiff seeks is a motion for a preliminary injunction with the benefit of both expedited discovery and supplemental briefing to aid in the Court's resolution of some perceived issues noted herein. Accordingly, the Court denies Plaintiff's request for a temporary restraining order. *See, e.g.*, *Catalent, Inc. v. Danby*, No. 20-12368, D.E. Nos. 1-3 & 6 (D.N.J. Sept. 8, 2020) (denying plaintiff's motion for temporary restraints in a text order where defendant resigned employment as Senior Director of Business Development with plaintiff on January 31, 2020, and allegedly began a management position with the Business Development & Strategy team of a competitor on August 3, 2020, in violation of a twelve-month non-compete agreement).

---

[9] The Court notes Plaintiff failed to submit a proposed order in conjunction with its Motion, contrary to Local Civil Rule 7.1(e).

9

In advance of the anticipated supplemental briefing and upcoming preliminary injunction hearing, the Court makes a few initial observations based on the parties' submissions.

A preliminary injunction is an "extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). A court may grant a preliminary injunction only if a party shows: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Id.* When a party seeks a mandatory injunction, it must show that its right to such relief is "indisputably clear." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (quoting *Trinity Indus., Inc. v. Chi. Bd. & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)). A district court's decision to issue a preliminary injunction is discretionary. *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1334 (Fed. Cir. 2006).

***First***, assuming the non-compete is enforceable, the parties dispute a threshold issue— whether, under the non-compete provision quoted above, Defendant's "termination" date is June 21, 2024 (Defendant's position), or August 20, 2024 (Plaintiff's position). The Court is cognizant that a preliminary injunction may issue at the conclusion of expedited discovery set forth below only if this Court finds Defendant's "termination" occurred on August 20, 2024—bringing the six-month restriction to a close on February 20, 2025.[10] However, the parties do not cite any legal authority or reasoning in support of their respective competing views as to Defendant's "termination" date under the non-compete. (*Compare* Mov. Br. at 12, 16 & 26, *with* Opp. Br. at 8 n.6 & 9 n.9).[11] Thus, in their supplemental submissions, the parties shall explain the bases for

---

[10] Alternatively, if the Court were to find that Defendant's termination date occurred on June 21, 2024, Plaintiff's motion will likely become moot as of December 21, 2024.

[11] Plaintiff fails to address Defendant's position on this point in reply. (*See generally* Reply Br.).

their positions on this point, citing to relevant supporting facts and/or legal authority. Furthermore, to the extent Plaintiff seeks "equitable tolling"—which Plaintiff makes a passing reference to in its conclusion (Mov. Br. at 40)—Plaintiff shall also fully brief this argument in its supplemental submission, citing to relevant supporting legal authority.

*Second*, notwithstanding the parties' choice-of-law provision directing application of New Jersey law, Defendant urges the Court to find the non-compete unenforceable under Massachusetts law. (*See* Opp. Br. at 17–23; *see also* Ex. 1 to Compl. at 45 ("This Agreement shall be construed, interpreted and enforced in accordance with the internal laws of the State of New Jersey without regard to its conflicts of laws provision.")). Defendant acknowledges that New Jersey follows the Restatement (Second) of Conflict Laws § 187(2) and argues application of New Jersey law would be contrary to a fundamental policy of Massachusetts law because Massachusetts "has a materially greater interest than New Jersey in applying its laws to noncompete agreements with employees who reside and work in Massachusetts." (Opp. Br. at 18). In support of his argument, Defendant relies on the more recent enactment of the Massachusetts Noncompete Agreement Act ("MNCA"), Mass. Gen. Laws ch. 149, § 24L, which he contends prohibits imposition of another state's law "on a Massachusetts employee[] if that law would deprive the employee of protections afforded by the MNCA." (*Id.*).[12] However, the parties do not cite to any cases resolving a choice-of-law inquiry involving application or interpretation of the MNCA. (*See generally* Mov. Br.; Opp. Br.; Reply Br.). This Court located at least one case that declined to adopt Defendant's argument, albeit in the context of analyzing—and declining to apply—a Massachusetts forum selection clause. *See Onward Search LLC v. Noble*, No. 22-0369, 2022 WL 2669520, at *11 (D. Conn. July

---

[12] The MNCA, "which represents a change of Massachusetts policy on 'the requirements for an employee noncompetition agreement to be enforceable,' 'only applies to employee noncompetition agreements entered into on or after October 1, 2018.'" *Ethicon, Inc. v. Randall*, No. 20-13524, 2021 WL 2206106, at *6 (D.N.J. May 28, 2021) (quoting *Nuvasive, Inc. v. Day*, 954 F.3d 439, 444 (1st Cir. 2020)).

11

11, 2022) ("[A]lthough the [MNCA] could be read to suggest that Massachusetts law disfavors non-compete agreements, *see* Mass. Gen. Laws ch. 149 § 24L(b) (specifying minimum requirements for valid and enforceable non-competition agreement), a court may not 'refrain from applying the [parties'] chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law.'" (quoting Restatement (Second) of Conflict of Laws § 187 cmt. g)).

***Third***, Plaintiff's entire theory rests on Defendant's alleged breach of contract under the terms of the non-compete by "directly or indirectly ***providing services*** to Biogen that are ***similar to those he provided to Novartis*** during the last two years of his employment." (D.E. No. 1-1 at 18–19, ¶ 70). Notably, while Plaintiff outlined the general services Defendant provided to Novartis as its Global Head of Search & Evaluation (*see, e.g.*, Kreutz Decl. ¶¶ 11–19), it has not provided (i) the specific therapeutic areas he did (or did not) work in during his tenure as Global Head of Search & Evaluation, or (ii) any indicia of the service(s) Defendant currently provides to Biogen apart from conclusory assertions that his work is "essentially the same." (*See, e.g.*, Mov. Br at 26–27 (claiming that Defendant "is and will be performing the same or essentially the same work at Biogen as he did for Novartis" (citing Kreutz Decl. ¶ 21))). "[A] plaintiff's 'blanket statement' that failure to issue a preliminary injunction will cause irreparable harm . . . is insufficient." *MHA, LLC v. Siemens Healthcare Diagnostics, Inc.*, No. 15-1573, 2015 WL 9304543, at *4 (D.N.J. Dec. 21, 2015) (quoting *Stryker v. Hi-Temp Specialty Metals, Inc.*, No. 11-6384, 2012 WL 715179, at *5 (D.N.J. Mar. 2, 2012)); *see also INDECS Corp. v. Claim Doc, LLC*, No. 16-4421, 2017 WL 1086178, at *3 (D.N.J. Mar. 21, 2017) (explaining that "a conclusory statement in [a plaintiff's] affidavit" is insufficient to establish irreparable harm). Indeed, Plaintiff concedes "Feire may provide services other than those he provided to Novartis over the last two years to any other

12

employer, including Biogen." (Mov. Br. at 25; *id.* at 30 ("Fiere could have sought employment, including at Biogen, that would not violate his non-competition obligations")).[13] The Court cannot issue an injunction based on the facts currently before it and requires more details regarding the services Defendant provides to Biogen in his current role. This being said, the Court appreciates Plaintiff's concern in light of Defendant's new title as Biogen's "Head of Business Development/M&A and External Innovation" (Feire Decl. ¶ 45), coupled with the apparent concession that he had "inten[ded] to move to a similar role at Biogen" (Opp. Br. at 9).[14] However, standing alone, these facts are insufficient to meet Plaintiff's burden to establish the likelihood that Defendant is "provid[ing] services similar to those [he] provided to [Novartis]." (Ex. 1 to Compl. at 32).[15]

***Fourth***, although Plaintiff maintains it cannot be compensated adequately with monetary damages (Mov. Br. at 3 & 31), it provides no bases to draw this conclusion. In the event Defendant already pursued Novartis's therapeutic targets and "breached his Executive Agreement," as Plaintiff contends, any benefit to Biogen in acquiring said targets would be compensable with

---

[13] Moreover, Plaintiff's argument that "Novartis and Biogen ***likely*** compete in the area of neurology, where there are limited attractive acquisition or licensing targets in the marketplace" is speculative on its face and does not suggest that Defendant is assisting or intends to assist Biogen in the neurology sphere. (*See* Mov. Br. at 34 (emphasis added)).

[14] Defendant does not set forth any details regarding his current role and responsibilities at Biogen. (*See generally* Opp. Br.; Feire Decl.). Nor does his declaration contain any statement that his role at Biogen is "similar" to his prior role at Novartis. (*See* Feire Decl.).

[15] Significant here, based on the current record and Plaintiff's lack of arguments to the contrary, this is not a case in which Defendant maintained or transferred any Novartis confidential information to himself or Biogen. *Cf. Novartis Pharms. Corp. v. Alaimo*, No. 17-5774, (D.N.J. Aug. 16, 2017), D.E. No. 15 (Transcript of Ruling on Motion for Temporary Restraints) at 7:4–16 (finding an "imminent and substantial risk of disclosure of trade secrets and/or confidential information" where, in the months leading up to defendant's departure, she (i) had multiple electronic storage devices attached to her computer, (ii) scrubbed her Novartis-issued phone and tablet, and (iii) took a copy of her Novartis email). Nor does Plaintiff come forth with any evidence suggesting that it suspects Defendant has or is using Novartis's confidential information to Biogen's benefit. In the same vein, although Plaintiff tries to suggest that Defendant does not dispute that "he has and will analyze potential targets that he considered for Novartis and which Novartis may still be pursing" (Reply Br. at 1), he affirms that he has "not had any communication with any acquisition or licensing therapeutic targets that were, to [his] knowledge, actively being considered by Novartis at the time of [his] departure" (Feire Decl. ¶ 52).

monetary damages. *See, e.g.*, *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x 727, 732 (3d Cir. 2009) (noting where "a [purported] secret is revealed, there is nothing for an injunction to protect"). To the extent Plaintiff has other bases for its argument that it cannot be compensated adequately with monetary damages, it shall fully brief this argument in is supplemental submission, citing to relevant supporting facts and/or legal authority.

***Fifth***, as noted above, while it appears there were some loose discussions of a potential resolution prior to Defendant beginning employment at Biogen, most communications between counsel reflect the exchange of assurances as to Defendant's start date. This Court remains skeptical as to whether assurances without meaningful pursuit of settlement can justify delay in seeking injunctive relief. *See Stryker Corp. v. Hagag*, No. 21-12499, 2022 WL 3107163, at *20 (D.N.J. Aug. 3, 2022) (noting Stryker "admits that the assurances it sought in the initial months of the parties' dispute cannot be considered settlement discussions"). Here, it appears loose communications regarding prospective settlement occurred at the beginning of August—more than a month after Defendant resigned from Novartis and less than three weeks before August 20, 2024—Defendant's last day on Novartis's payroll. (*See* Beck Decl. ¶ 6). Viewing the facts in a light most favorable to Plaintiff, those discussions ceased between October 7, 2024, and October 17, 2024, when Mr. Weibust responded to Mr. Beck noting both times that he had "nothing new to report." (*Id.* ¶¶ 17–18); *see Commc'ns Workers of Am. v. Alcatel-lucent USA Inc.*, No. 15-8143, 2015 WL 7573206, at *3 (D.N.J. Nov. 25, 2015) (finding that plaintiffs' delay "undercut[] their claim of irreparable harm and the alleged need for emergent relief" where defendant informed plaintiffs of transfers on September 14, 2015 and plaintiffs commenced suit on November 18, 2015, "over two months after learning of the planned transfers and less than two weeks before the planned transfers were set to occur"). Furthermore, unlike the prior matter this Court presided

over between Novartis and another former employee, Defendant has already begun employment at Biogen. *See Novartis Pharms. Corp. v. Alaimo*, No. 17-5774, (D.N.J. Aug. 16, 2017), D.E. No. 15 (Transcript of Ruling on Motion for Temporary Restraints) at 5:25–6:1 (noting that defendant was "set to really start at Biogen today"—i.e., the date of the Court's ruling).

Accordingly, for the foregoing reasons and for good cause shown,

**IT IS** on this 20th day of November 2024,

**ORDERED** that Plaintiff's Motion for a temporary restraining order (D.E. No. 4) is **DENIED**; and it is further

**ORDERED** that the Court will treat Plaintiff's Motion (D.E. No. 4) as one for a preliminary injunction with the benefit of supplemental briefing and expedited discovery as set forth below; and it is further

**ORDERED** that Plaintiff's request for expedited discovery is **GRANTED** and the parties may begin expedited discovery, relevant and tailored to the requested injunctive relief, as follows:[16]

1. The parties may serve written discovery requests, limited to five (5) interrogatories and five (5) document requests per side (including subparts), by November 25, 2024;

2. The parties shall serve any responses to such requests by December 11, 2024;

3. The parties may take up to two (2) fact depositions each, on mutually agreed upon dates and times, but no later than December 20, 2024;

4. The parties shall serve any third-party discovery requests by November 25, 2024;

---

[16] In light of this Memorandum, Plaintiff may amend its proposed discovery requests as may be appropriate and serve them in accordance with the schedule set forth below.

  5.  The parties shall meet and confer on whether additional limited discovery in the form of requests for admission and/or expert depositions is appropriate;

  6.  To the extent necessary, the parties shall contact Magistrate Judge Jessica S. Allen, U.S.M.J. to resolve any discovery disputes; and

  7.  All discovery in this action shall be produced subject to a negotiated proposed confidentiality order that the parties shall submit for the Court's consideration; and it is further

**ORDERED** that the parties shall complete all expedited discovery by December 20, 2024—absent extraordinary circumstances, no extensions will be granted; and it is further

**ORDERED** that Plaintiff shall file a supplemental moving brief in support of a preliminary injunction by January 3, 2025;[17] and it is further

**ORDERED** that Defendant shall file a response to Plaintiff's supplemental submission by January 9, 2025; and it is further

**ORDERED** that Plaintiff shall file any reply brief in further support of a preliminary injunction by January 13, 2025; and it is further

**ORDERED** that the Court will hold an in-person hearing on Plaintiff's motion for a preliminary injunction on January 24, 2025, at 1:00pm, and shall, if necessary, continue on January 27, 2025;[18] and it is further

**ORDERED** that the Court will conduct the preliminary injunction hearing based upon the parties' existing and supplemental submissions, but the Court will permit the parties' respective counsel to cross-examine any affiants who have submitted or will submit any affidavits to the

---

[17] To the extent the parties file exhibits in support of their positions, the Court respectfully requests that each exhibit be filed as a separate attachment on the docket and labeled accordingly.

[18] The Court's scheduling order accounts for its trial schedule in January and February 2025.

Court in connection with the requested injunctive relief; and it is further

**ORDERED** that, by no later than five (5) business days before the preliminary injunction hearing, the parties shall provide a witness list to the Court, including a list of any affiants whom they anticipate cross-examining at the hearing; and it is further

**ORDERED** that individuals with full settlement authority for both parties shall be present for the duration of the preliminary injunction hearing.

*s/ Esther Salas*  
**Esther Salas, U.S.D.J.**